IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:13-CV-254-FL

| | |
|---|---|
| CARRIE V. MOORE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM &** |
| ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Carrie V. Moore filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her applications for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The time for filing responsive briefs has expired, and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, the undersigned recommends that Plaintiff's Motion for Judgment on the Pleadings [DE #24] be granted, Defendant's Motion for Judgment on the Pleadings [DE #30] be denied, and the matter be remanded to the Commissioner for further consideration.

## STATEMENT OF THE CASE

Plaintiff filed applications for a period of disability, DIB, and SSI on August 18, 2010, alleging disability beginning July 3, 2009. (Tr. 23.) The applications were denied initially

and upon reconsideration, and a request for hearing was filed. (Tr. 23.) On April 26, 2012, a hearing was held before Administrative Law Judge Robert Phares ("ALJ"), who issued an unfavorable ruling on July 10, 2012. (Tr. 23-34.) On October 25, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5.) Plaintiff now seeks judicial review of the final administrative decision pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

### I. Standard of Review

The scope of judicial review of a final agency decision denying disability benefits is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; [i]t consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)) (internal quotation marks and citation omitted) (alteration in original). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589) (internal quotation marks omitted) (first and second alterations in original). Rather, in conducting the "substantial evidence" inquiry, the court determines whether the Commissioner has considered all relevant evidence and sufficiently explained the

weight accorded to the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439–40 (4th Cir. 1997).

**II.     Disability Determination**

In making a disability determination, the Commissioner utilizes a five-step evaluation process.  The Commissioner asks, sequentially, whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1; (4) can perform the requirements of past work; and, if not, (5) based on the claimant's age, work experience, and residual functional capacity can adjust to other work that exists in significant numbers in the national economy.  *See* 20 C.F.R. § 404.1520; *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 475 n.2 (4th Cir. 1999).   The burden of proof and production during the first four steps of the inquiry rests on the claimant.   *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).   At the fifth step, the burden shifts to the Commissioner to show that other work exists in the national economy that the claimant can perform.   *Id*.

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id*. §§ 404.1520a(c)(3), 416.920a(c)(3).   The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id*. §§ 404.1520a(e)(3), 416.920a(e)(3).

3

**III.    ALJ's Findings**

Applying the five-step, sequential evaluation process, the ALJ found Plaintiff "not disabled" as defined in the Social Security Act. At step one, the ALJ found Plaintiff had not engaged in substantial gainful employment since July 3, 2009. (Tr. 25.) Next, the ALJ determined Plaintiff had the following severe impairments: "depressive disorder, left foot cellulitis, and borderline intellectual functioning." (*Id.*) However, at step three, the ALJ concluded Plaintiff's impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 26-28.)

Prior to proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC"), and found that Plaintiff had the ability to perform a limited range of medium work:

> Function by function, the claimant is capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently, and can sit, stand, or walk six hours in an eight-hour workday. However, the claimant is restricted to work involving only simple, routine, repetitive tasks, with only occasional contact with the general public and coworkers. In addition, she is unable to perform high stress jobs.

(Tr. 28.) In making this assessment, the ALJ found Plaintiff's statements about the severity of her symptoms not fully credible. (Tr. 29.) At step four, the ALJ concluded Plaintiff has no past relevant work. At step five, upon considering Plaintiff's age, education, work experience and RFC, the ALJ determined Plaintiff is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (Tr. 33.) Accordingly, the ALJ determined that Plaintiff was not under a disability during the relevant time period.

### IV. Plaintiff's Contentions

Plaintiff challenges the Commissioner's final decision denying benefits on a number of grounds. Plaintiff first contends that substantial evidence does not support the ALJ's determination that Plaintiff's impairments did not meet or medically equal Listing 12.05 or Listing 12.04. (Pl.'s Mem. Supp. Mot. J. Pleadings [DE #25] at 11-23.). Next, Plaintiff asserts that substantial evidence does not support the ALJ's RFC determination. (*Id.* at 23-26.) Finally, Plaintiff argues that the vocational expert's testimony does not support the ALJ's finding that Plaintiff is capable of performing other work that exists in significant numbers in the national economy. (*Id.* at 26-27.)

#### A. Listings

The burden of proof at step three is on the claimant to show that she meets or equals all the criteria of a listing. *Hunter v. Sullivan*, 993 F.2d 31 (4th Cir. 1992). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If an impairment does not meet the criteria of a listing, it may nevertheless medically equal the criteria. 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5). To establish medical equivalence, a claimant must "present medical findings equal in severity to all the criteria" for that listing. *Zebley*, 493 U.S. at 531. "The [ALJ] . . . is responsible for deciding . . . whether a listing is met or equaled." SSR 96-6p, 1996 WL 374180, at *3 (Jul. 2, 1996). In doing so, the ALJ must "consider all evidence in [the claimant's] case record about [the] impairment(s) and its effects on [claimant] that is relevant to this finding." 20 C.F.R. §§ 404.1526(c), 416.926(c).

5

1. Listing 12.05

Plaintiff contends that she is disabled under Listing 12.05 and that substantial evidence does not support the ALJ's conclusion to the contrary. Listing 12.05 sets forth a two-part inquiry for determining whether a claimant meets the criteria of intellectual disability. A claimant must first show that she meets the diagnostic description for intellectual disability – that she has "significantly subaverage general intellectual functioning with deficits in adaptive functioning," both of which manifested before the age of twenty-two. *Norris v. Astrue*, No. 7:07-CV-184-FL, 2008 WL 4911794, at *2 (E.D.N.C. Nov. 14, 2008). Additionally, a claimant "must meet the required severity level by satisfying one of four categories labeled (A) through (D)." *Dixon v. Astrue*, No. 7:08-CV-218-FL, 2009 WL 4545262, at *2 (E.D.N.C. Dec. 4, 2009). Plaintiff maintains that she meets the criteria of both category B and category C. Category B is satisfied by "[a] valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(B). Category C is met where a claimant has (1) "[a] valid verbal, performance, or full scale IQ of 60 through 70"; and (2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C).

With respect to the first part of the inquiry, the ALJ found that Plaintiff "had not shown that she had deficits in adaptive functioning" prior to age twenty-two. He characterized the evidence as demonstrating "adequate" adaptive functioning skills due primarily to Plaintiff's ability to "successfully" maintain employment, the fact that she "successfully" raised four children on her own, and Plaintiff's ability to "navigate public transportation." (Tr. 27.) As further support for his finding, the ALJ noted that during psychological evaluations in 2011, Plaintiff "was able to understand questions asked of her[] and answered them coherently and relevantly," that she

reported playing tic tac toe, and "was able to multiply single digits correctly, subtract two digit numerals from a two digit numerals [sic], and able to subtract fractions . . . with a common denominator." (Tr. 27-28.)

The ALJ's reasoning in this regard is flawed in a number of respects. First, he does not appear to have applied the correct standard. The inquiry is not whether a claimant has "adequate" adaptive functioning skills, but whether she has shown "deficits in adaptive functioning" before age twenty-two. Plaintiff's school records demonstrate that she dropped out of high school in the tenth grade at the age of seventeen or eighteen. Although she returned the following academic year, she failed two courses that year. From 1983 through 1986, she appears to have been placed in a special school setting or educational program designated "ESDP." (Tr. 253, 491.) During these years, Plaintiff took a limited number of courses each year[1] and received instruction from a single teacher throughout each academic year. (Tr. 253.) Over the six-year period she was enrolled in high school, Plaintiff received credit for four English courses, one social studies course, three math courses, two science courses, and one health and physical education class. (Tr. 253.) Plaintiff's academic records also establish that she failed competency tests in 1982, 1983, 1984 and 1985. (Tr. 254, 491.)

At her administrative hearing, Plaintiff confirmed that she was in special education classes. (Tr. 52-53.) When asked about her performance in ninth grade English, Plaintiff stated that her teacher would tell her the answers. (Tr. 53.) Although Plaintiff's academic records prior to high school are not available, Plaintiff testified that she failed the first grade and either the fifth or sixth

---

[1]During the 1983-84 school year, Plaintiff successfully completed three courses, which are noted as "ESDP Basic English 11," "ESDP American Studies" and "ESDP Survival Skills." The following year, she completed English 12. During the 1985-86 year, she successfully completed two of three courses in which she was enrolled – Basic Biology and General Math 3. (Tr. 253.)

7

grade. (Tr. 53.) Her testimony in this regard appears consistent with the other evidence, as school records indicate she entered ninth grade at the age of sixteen. Plaintiff quit school at the age of twenty-two and does not appear to have received significant instruction beyond that time.[2]

Plaintiff's enrollment in special education classes, poor performance on state competency testing, and inability to complete high school over six academic years constitute evidence of deficits in adaptive functioning prior to age twenty-two. *See Dixon*, 2009 WL 4545262, at *3. While the ALJ acknowledged Plaintiff's academic difficulties, he found this evidence unpersuasive, focusing instead on Plaintiff's more recent adaptive functioning. To the extent Plaintiff's more recent functioning may be relevant to a determination of her adaptive functioning prior to age twenty-two, the ALJ's findings are not supported by the record. First, the record establishes that from 1979 through 2002 Plaintiff was only sporadically employed. (Tr. 244.) Although Plaintiff's earnings record suggests she was more consistently employed from 2002 through 2009, her employment was on a part-time basis and, as noted by the ALJ, never rose to the level of substantial gainful activity. (Tr. 33, 47.) Additionally, Plaintiff testified that she was fired or "let go" by a number of employers after having worked for only a short period of time. (Tr. 50.) In 1999, Plaintiff earned a total of $251 in wages from Village Realty and Management Services. In 2007, Plaintiff was "let go" by Shoe Show, Inc., where she earned a total of $76.88 "put[ting] shoes in a box." (Tr. 50, 246.) Suffice it to say that the record does not support the ALJ's finding that Plaintiff successfully maintained employment.

The same is true of the ALJ's findings that Plaintiff successfully reared four children on her own and that she is able to navigate public transportation. Plaintiff testified that she has four

---

[2] Plaintiff testified that she "went to another special class" in Roper, North Carolina, "to help her learn." (Tr. 54.) It is not clear from the record whether Plaintiff was referring to the ESDP classes or other coursework. However, Plaintiff stated that she "just couldn't do it," so she quit. (Tr. 54.)

8

Case 4:13-cv-00254-FL   Document 32   Filed 02/02/15   Page 8 of 16

children, all of whom are grown, and that she has never married. (Tr. 43.) Nevertheless, there is simply no evidence in the record to indicate whether or not Plaintiff reared her four children or did so without assistance. In fact, Plaintiff testified that she had a mentor until she lost Medicaid benefits due to her youngest son aging out. Her mentor would come to her home and assist her with daily living activities, take her to medical appointments, and assist her with paperwork, such as filling out her social security applications. (Tr. 58-59.) Plaintiff testified that when she was working, her mother and son helped manage her money. (Tr. 60.) When asked how she got to work, Plaintiff stated, "There was a bus come by, or sometime my son.. . . [The bus] wasn't too far from where I was working at." (Tr. 45.) Elsewhere, the record reflects that Plaintiff received some transportation via an "agency van." (Tr. 513.) Even assuming that Plaintiff took a "city bus" to work, as opposed to transportation provided by the Department of Social Services or some other agency, such activity can hardly be said to shed great light on Plaintiff's functional abilities in a municipality like Plymouth, where the population was less than 4,000. *See* U.S. Census Bureau American Fact Finder: Annual Estimates of Resident Population for Plymouth, NC, http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk (last visited Jan. 29, 2015) (reporting estimated population of 3,878 as of April 1, 2010).

Moreover, the ALJ's findings with regard to Plaintiff's functional abilities are not borne out by the medical evidence of record. Plaintiff underwent three psychological evaluations in connection with her disability claims. The first evaluation was conducted August 27, 2009, by Dr. Richard J. Bing. He reported that Plaintiff was a poor historian (Tr. 381) and noted her "[a]ffect was consistent with cognition and mood appeared mildly depressed" (Tr. 382). Given her performance, he suspected she was not putting forth her best effort, and he did not believe a "valid mental status evaluation [was] achieved." (Tr. 381.) As a result, he did not provide a

9

diagnosis with regard to her intellectual abilities, but he did find her intellectual functioning impaired. (Tr. 383.) He stated, "It is possible she could have difficulties in terms of interpersonal relations within the work site." (Tr. 383-84.)

In March 2012, Plaintiff underwent a comprehensive consultative psychological evaluation with Dr. E. J. Burgess. Dr. Burgess administered the Weschler Adult Intelligence Scale – Fourth Edition ("WAIS-IV") and the Wide Range Achievement Test – Fourth Edition ("WRAT-4"). On mental status examination, Dr. Burgess indicated that Plaintiff was "obviously lower functioning" with a limited vocabulary and "limited social skills." (Tr. 491.) He found her to be cooperative and stated that "the results of the evaluation appear[] to be a valid representation of her current level of function." (Tr. 491.) Plaintiff was noted to have "engrained and maladaptive personality features that cause her to be overly sensitive." (Tr. 492.) Her scores on the WAIS-IV "documented Mild Mental Retardation," which Dr. Burgess expected "given [his] clinical observations" and the difficulties she experienced in school. (Tr. 492.) He indicated that her scores on the Coding and Symbol Search and the Perceptual Reasoning subtests may have been attenuated due to her visual impairment. (Tr. 492.) However, her Verbal Comprehension Index standardized score of 58 and Working Memory Index score of 66 were noted to be "valid and reliable." (Tr. 492.) He opined that her "impaired verbal intellect appears to be a lifelong issue as opposed to a more recent concern." (Tr. 492.) On the WRAT-4, Plaintiff scored below the first percentile in all areas, with the following scores: Word Reading (55), Reading Comprehension (55), Spelling (61), and Math Computation (55). In his summary of findings, Dr. Burgess stated:

> During the course [of] this evaluation, it was obvious that [Plaintiff is an] intellectually compromised individual who has superimposed dysthymia and maladaptive personality features. As a result, she is low functioning, she has a low tolerance level for frustration, she is easily irritated, and she has limited coping

10

resources. As a result, she will have marked difficulty understanding and retaining information. Additionally, her ability to sustain attention, to tolerate the stress of day to day work, and to interact socially with others is markedly compromised.

(Tr. 493.)

Plaintiff was reevaluated by Dr. Bing on May 14, 2012. Noting his prior concerns about the validity of her 2009 evaluation, Dr. Bing stated that she was "cooperative to the best of her apparent ability" and "appeared to put forth her best effort" during the May 2012 evaluation. (Tr, 502-03.) Academic testing on the Woodcock-Johnson – III Test of Achievement was noted to be "appreciably higher" than obtained on the WRAT-4 administered by Dr. Burgess but still indicated severe intellectual impairment.[3] (Tr. 506.) Dr. Bing estimated Plaintiff's intellectual functioning to be in the range of mild mental retardation to the low end of borderline intellectual functioning. (Tr. 507.) Given the overwhelming evidence of Plaintiff's functional deficits, the ALJ erred in determining that Plaintiff had failed to demonstrate deficits in adaptive functioning prior to age twenty-two.

The ALJ also erred in his analysis of the category B and category C criteria. As to category B, the ALJ required proof of a full-scale IQ of 59 or less. (Tr. 28.) However, category B is satisfied by "[a] valid verbal, performance *or* full scale IQ of 59 or less." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(B) (emphasis added). "In cases where more than one IQ is customarily derived from the test administered, e.g., where verbal, performance, and full scale IQs are provided in the Weschler series, [the Commissioner] use[s] the lowest of these . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(D)(6)(c).

---

[3] On the Math Calculation subtest, Plaintiff scored in the fourth percentile, with a grade equivalency of 3.5. On the other subtests, Plaintiff ranked as follows: Letter-Word Identification (tenth percentile or 3.7 grade equivalency); Passage Comprehension (second percentile or 1.7 grade equivalency); Applied Problems (eleventh percentile or 4.4 grade equivalency); and Writing Samples (seventh percentile or 2.0 grade equivalency).

Additionally, the ALJ outright rejected Plaintiff's IQ scores on the ground they were invalid, stating:

> Although the claimant underwent IQ testing in March 2012 . . . which showed she had a full scale IQ of 55, the undersigned finds this score is inconsistent with other evidence in the record of the claimant's daily activities and behavior, which show a lack of deficits in adaptive functioning. The full scale IQ of 55 is also inconsistent with medical findings of other mental evaluations in the record. . . . As already mentioned, the record shows the claimant has been able to successfully maintain employment at the semiskilled level, has raised four children, has navigated public transportation independently, understands questions asked of her and answers coherently and relevantly, plays games such as tic tac toe, and can do simple calculations, as well as more difficult calculations.

(Tr. 28.) Although an ALJ may discount an IQ score where it is inconsistent with other evidence of the claimant's functional abilities, *see Hancock v. Astrue*, 667 F.3d 470, 474-75 (4th Cir. 2012), such is not the case here. While Dr. Burgess indicated that Plaintiff's scores on the Perceptual Reasoning and Coding and Symbol Search subtests may have been compromised due to Plaintiff's visual impairment, no question was raised as to the validity of Plaintiff's other scores. Nor does the evidence suggest that Plaintiff's true intellectual functioning falls outside both the category B and category C criteria. Even accounting for Plaintiff's "appreciably higher" scores on the Woodcock-Johnson – III Achievement Test, Plaintiff's intellectual functioning is estimated to be between the mild mental retardation range and the low borderline intellectual functioning range. (Tr. 517.) Moreover, although not raised by Plaintiff, should Plaintiff's true intellectual functioning fall outside the category B and C criteria due to attenuation caused by a visual impairment,[4] it would be incumbent upon the ALJ to then consider whether her higher IQ score, when considered in combination with her visual impairment, medically equals Listing 12.05.

---

[4] There appears to be no dispute that Plaintiff has a visual impairment. However, the ALJ did not address her visual impairment, either as a severe or non-severe impairment, at any step of the sequential evaluation process.

Finally, the ALJ erred in determining that Plaintiff does not meet category C's requirement that she have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *See* 20 C.F.R. § 404, Subpt. P, App. 1 § 12.05(C). The "work-related limitation of function" requirement is met where the claimant is found to have a severe impairment at step two of the sequential evaluation process. 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(A); *Luckey v. U.S. Dep't Health & Human Servs.*, 890 F.2d 666, 669 (4th Cir. 1989). Here, the ALJ found that Plaintiff's depressive disorder and left foot cellulitis both significantly limited her ability to perform work activities. The ALJ's finding in this regard established Listing 12.05(C)'s "work-related limitation of function" requirement.

### 2. Listing 12.04

Plaintiff further contends that substantial evidence does not support the ALJ's finding that her impairments do not meet or medically equal the criteria for Listing 12.04 (Affective Disorders). As relevant here, paragraph A of Listing 12.04 requires "[m]edically documented persistence, either continuous or intermittent," of depression "characterized by at least four of the following" symptoms:

    a. Anhedonia or pervasive loss of interest in almost all activities; or

    b. Appetite disturbance with change in weight; or

    c. Sleep disturbance; or

    d. Psychomotor agitation or retardation; or

    e. Decreased energy; or

    f. Feelings of guilt or worthlessness; or

    g. Difficulty concentrating or thinking; or

    h. Thoughts of suicide; or

    i. Hallucinations, delusions, or paranoid thinking.

20 C.F.R. § 404, Subpt. P, App. 1 § 12.04(A). Additionally, the symptoms must result in at least two of the following "paragraph B" criteria:

  1. Marked restriction of activities of daily living; or

  2. Marked difficulties in maintaining social functioning; or

  3. Marked difficulties in maintaining concentration, persistence, or pace; or

  4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. § 404, Subpt. P, App. 1 § 12.04(B).

  In this case, it appears as though the ALJ determined that Plaintiff's depression satisfied the "paragraph A" criteria for Listing 12.04, and substantial evidence supports that determination. However, the ALJ further found that Plaintiff's mental impairments did not satisfy the "paragraph B" criteria. He determined that Plaintiff had a mild restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. 26.)

  With regard to activities of daily living, the ALJ explained:

> Although the claimant alleges she requires help getting dressed and with other personal care activities, and that her mother does most of the cooking, chores, and money management, the record shows the claimant has four grown children that she successfully raised. There is no indication that these children were raised by anyone but the claimant, which shows she has a higher level of functioning than she alleges. In addition, the claimant testified that she relied heavily on public transportation in order to get to and from work. The fact that she is able to navigate public transportation also shows she has less restriction in activities of daily living than she alleges.

(Tr. 26.) As set forth above, substantial evidence does not support the ALJ's findings that Plaintiff successfully reared four children on her own or that her means of transportation evidences greater functional abilities than alleged by Plaintiff.

The ALJ further found that Plaintiff exhibited moderate difficulties in the areas of social functioning and concentration, persistence or pace. However, it is not clear from the ALJ's analysis whether he considered Dr. Burgess' opinions that Plaintiff has "marked difficulty understanding and retaining information," and that "her ability to sustain attention, to tolerate the stress of day to day work, and to interact socially with others is markedly compromised." (Tr. 493.) The ALJ also did not discuss what weight, if any, he gave to Dr. Bing's opinion that Plaintiff has marked impairments in understanding, remembering and carrying out complex instructions (Tr. 509) and moderate to marked difficulties interacting appropriately with supervisors (Tr. 510). Absent further explanation, the court is unable to determine whether the ALJ's findings with regard to Listing 12.04 are supported by substantial evidence and based upon the proper legal standards.

B.       RFC Determination & VE Hypothetical

Next, Plaintiff contends that the ALJ did not account for all of Plaintiff's impairments in determining Plaintiff's RFC and that the RFC is, therefore, not supported by substantial evidence. Specifically, Plaintiff asserts that the evidence demonstrates that Plaintiff is "so limited by her mild mental retardation, depressive disorder and left leg cellulitis" (Pl.'s Mem. Supp. Mot. J. Pleadings at 26) that she "would not be able to perform the lifting and standing requirements of medium level work[] and would not be able to withstand the psychological rigors of full-time employment of any kind" (*id.* at 27.) Had the vocational expert been provided with a hypothetical that encompassed all of Plaintiff's limitations, Plaintiff asserts, the vocational expert's testimony would have required a finding that Plaintiff is disabled.

As explained hereinabove, the undersigned recommends that this case be remanded to the Commissioner for further consideration of Plaintiff's limitations at step three of the sequential

analysis. Given the possibility that the findings on remand may significantly impact the ALJ's RFC determination, the undersigned expresses no opinion whether the ALJ erred in his RFC determination and hypothetical to the vocational expert.

## CONCLUSION

For the reasons stated above, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings [DE #24] be GRANTED, Defendant's Motion for Judgment on the Pleadings [DE #30] be DENIED and the case be REMANDED to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with the Memorandum and Recommendation..

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who shall have fourteen (14) days from the date of service to file written objections. Failure to file timely, written objections shall bar an aggrieved party from obtaining de novo review by the District Judge on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Judge.

This 2nd day of February 2015.

*Kimberly A. Swank*
KIMBERLY A. SWANK
United States Magistrate Judge